WILLIAM M. ROSS, and JOHN H. ROSS, Appellants, *v.* ADAM G. INNIS, Appellee.

APPEAL FROM THE SUPERIOR COURT OF CHICAGO.

It is not required that a crime shall have been committed before probable cause for an arrest can exist; facts may exist which will create a belief of crime, when the *quo animo* with which the act was done will change its character.

Where a party consults with competent legal counsel in good faith, to ascertain what course to pursue in reference to acts done by another, and such counsel, after proper deliberation and examination into the facts, advises an arrest for a criminal offense, the party causing the arrest should not be held to respond in damages, for want of probable cause for his action in the premises.

THIS was an action for malicious prosecution, brought in the Superior Court of Chicago, by Adam G. Innis against William M. and John H. Ross.

Declaration in trespass on the case, and alleged that the defendants had caused the plaintiff falsely and maliciously and without any probable cause to be arrested on a charge of embezzlement; that he was brought before the magistrate and an examination had, and that the plaintiff was discharged, etc.

Plea, general issue.

The cause was tried in December term, 1860, and verdict given for plaintiff for $5,000.

Motion for new trial was granted.

The cause was again tried, and verdict for plaintiff for $3,000.

On the trial the plaintiff proved by *Samuel Straus* that he was a notary public, and that William M. Ross swore to the following affidavit:

STATE OF ILLINOIS, } ss.
    COOK COUNTY.      }

William M. Ross, one of the firm of William M. Ross & Co., a mercantile copartnership in the city of Chicago, in said county, composed of the said William M. Ross, and John H. Ross, being duly sworn, upon his oath deposes and says that, on the 29th day of September, A. D. 1855, the said firm of William M. Ross & Co., employed in their said service one Adam G. Innis, as their cashier; and that said Adam G. Innis continued in said employment as such cashier from the said 29th day of September, A D. 1855, until and including the 12th day of December, A. D. 1859. And this affiant further deposes and says, that it then and there became, and was, and continued to be, during the said service or employment of the said Adam G. Innis, his duty to receive, safely keep, and disburse all moneys which came to the possession of said William M. Ross & Co., for the use and benefit of the said William M. Ross & Co., and under their direction and in pursuance of their orders. And affiant further deposes and says that, by means of the premises, the said Adam G. Innis then and there became and was the servant, clerk or agent of the said William M. Ross & Co. And affiant further deposes and says, that afterwards, and during the continuance of the said employment, the said Adam G. Innis was intrusted by the said William M. Ross & Co., with the sum of one hundred and sixty-six dollars in bank bills or notes upon various banks, and of various denominations which are severally unknown to this affiant, and to his said firm; and that afterwards, to wit, on the 12th day of December, A. D. 1859, the said Adam G. Innis, did then and there, without the knowledge or consent of the said William M. Ross & Co., and against their will, feloniously convert and appropriate to his own use, and embezzle from the said William M. Ross & Co.,

with intent then and there to steal the same, the sum of one hundred and sixty-six dollars; which sum of one hundred and sixty-six dollars in bank bills or notes was then and there the property of the said William M. Ross & Co.; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the people of the State of Illinois, and further this affiant saith not.

W. M. ROSS.

Subscribed and sworn to before me, this 27th day of December, A. D. 1859.

SAMUEL STRAUS, *Notary Public.*

The plaintiff then called as a witness, *Isaac L. Milliken,* who testified as follows: I am a justice of the peace, in the city of Chicago, and was, on the 27th day of December, A. D. 1859. He further testified, that upon the affidavit heretofore given he issued a warrant on the complaint of William M. Ross, against Adam G. Innis, for embezzlement, which warrant is in the usual form, and is contained in the record.

Witness further stated, that he thought he delivered the warrant to William M. Ross; not positive whether he delivered it to him or to an officer; that plaintiff came to his house; came in charge of an officer, and gave bail to appear at a future day.

The bond was given in evidence.

The witness further testified as follows: Plaintiff was afterwards examined before me and discharged. Upon cross-examination he said, the affidavit is in the handwriting of Robert S. Blackwell; I went into a full investigation of the charge; there were several witnesses examined; the charge was embezzlement, and I thought the People had not made out a cause; it did not appear to me to be such a case of embezzlement as to make a crime; I did not think there was an intent to steal. I do not recollect whether the defendants testified to any other fact than was testified to by other witnesses; there was evidence of a conversation between the Rosses and Innis; the evidence of one of the defendants, to the best of my recollection, was that there was an agreement that Innis should assume a certain debt contracted by his brother; I cannot recollect the amount; it was more than two hundred dollars, and perhaps more than three hundred; the debt was to be paid by his services, or out of his salary; I don't recollect that any other witness testified to these facts; the defendants were testifying to an agreement they had with plaintiff, and stated this as the agreement. John Ross was examined as a witness.

*William M. Douglass* testified, That he was an officer, and received the warrant and arrested the plaintiff on West Lake

street, in Chicago, on 27th day of December, 1859, near sun-
down, and brought him to the court house to Justice Milliken;
he had gone home. The witness then proceeded as follows: I
met one of Ross' clerks and told him to send Ross up; I met
William M. Ross as I was leaving the court house, and told him
his case could not be tried that night; Ross said he could not
be ready till next day; I then went with plaintiff to Hervey's
office; I took Innis with me; we then went to Milliken's office,
and went to Murray and brought Murray and gave bail; Hervey
went with me; I got the warrant from the city marshal; he and
Ross wanted it served; I went before service to Ross' store;
saw defendants there; they told me where plaintiff lived, and
sent a boy with me. The witness further stated that he ar-
rested plaintiff about nine or ten o'clock that night, and that he
was released on bail, and that he was present at the examination.

The witness testifies at the time of plaintiff's discharge, Wil-
liam M. Ross said if anybody came to him for any references,
he should say that Innis was a scoundrel and a thief.

The plaintiff then called as a witness, *Adam Murray*, who
testified as follows: The plaintiff and defendants are cousins;
I have known them from infancy. After plaintiff left defendants'
store, John H. Ross wrote me a note desiring to see me on very
particular business. I went and saw him in the store; he told
me he had a telegram from his brother William, in New York.
He said Innis had taken $166 from the desk, and that he had
telegraphed to his brother in New York, and had just received
a telegram from him to arrest Innes for embezzlement, for taking
this money, for it was the same as stealing. I said I had not
seen Innis for some days; he said he would bring him from
Texas if he went there; I told him he need not go so far, he
would find him at his father's, on the west side. He read to me
the telegram from William, I think, or told me its contents, I
don't know which. He said I had better see Innis. I said I
would; that some one must be wrong. Either the truth was
not told, or Innis was wrong. I could not believe Innis could
do such a thing. I took the first opportunity to see Innis, and
told him what Ross said. I saw John H. Ross a day or two
after the first interview, about the 18th or 20th of December.
I told him I had a message from Innis to him. I delivered the
message. On hearing the message, Ross said he would arrest
Innis immediately. I told him he had better be cautious, he
might put Innis in a better position than he was before. He
said: Nonsense, you don't suppose he would fight such a house
as this. Ross wanted me to see Innis, to tell him he would
arrest him unless he would pay back the money.

Innis desired me to tell Ross that the money he took was no

more than was justly due him, and was the balance of his salary, and would not pay it back. That he could not arrest him without he committed perjury, and if he did commit perjury he would punish him. I told Ross this, and that Innis said that any understanding about his brother's debt was based on paying out of the assignment of his brother. Ross said there was an account of Innis' brother in the books, which was charged to Adam Innis.

William M. Ross returned from New York within eight or ten days, and before the arrest. I went to the store on some business. William Ross told me that Adam Innis had taken $166 from the desk, and he was determined to make an example of him; that it was against the rules of the store that any one should take any money without his leave, or in the way he had taken it. That he would ruin him in Chicago, and he would never get a situation in Chicago as long as he lived; that he would bring him before the police magistrate, and if he did not convict him, he would get him indicted before the grand jury. I asked him what did he want Innis to do. He said he would make an example of him; it was not the money, but to make an example of him. I told him I would see Innis and let him know next day. I saw Innis, and told him the very words above stated. I was expecting to bring about peace, and told each of them what the other said. Innis told me to say to Wm. Ross that he took no money except the balance of his salary, and no more; that he could not arrest him without committing perjury, and that if he committed perjury he would take him up for it. I told this to William Ross. I don't recollect what he said, except he said he would punish him. One correction I would make in the message from Innis to John Ross; that is, "I took only the money coming to me, and entered it in the book, and showed it to John Ross."

Innis was arrested about four days after my talk with William Ross; John said he would land him in Joliet or State penitentiary before he got through with him. I was present at the examination before Milliken; John and William Ross were both present; immediately after Innis was discharged, and in presence of justice, William Ross said, if any one asked him for a character of Innis, he would say he stole $166 of him, and was a liar and a thief.

Innis had been employed four to six years by Ross & Co., up to the 12th of December, 1859; up to this time William Ross had always spoken well of Innis, and said he was an honorable young man, and lately he made the same remark; and that he, Innis, must have had bad advisers, or he would not have done what he did.

Upon cross-examination, the witness testified as follows:

It was the second interview when John Ross said he would send him to Joliet; William Ross said, in reply to Innis' message, that he would have him punished; William Ross may have said that Innis had guaranteed his brother's debt; I would rather say that he said so than he did not; I did not testify on the former trial that Ross said the effect of arresting Innis would be to ruin him in Chicago; I did not say so before the justice.

On being re-examined by plaintiff's counsel, he testified as follows:

The last conversation with William Ross, when I took Innis' message, was to the effect that he would punish him; I saw William Ross three days before the last conversation; he then said plaintiff had taken $166, against the rule of the store; the statement that plaintiff had guaranteed his brother's debt was in the first conversation.

The plaintiff then called as a witness, *George Kennedy*, who testified as follows: I am book-keeper for defendants, and have been for six years, and during all the time plaintiff was cashier. On Saturday evening, December 10th, previous to his leaving, plaintiff asked me to make out his account; I made out a copy for him and handed it to him.

The plaintiff then offered in evidence the account of the plaintiff on the books of the defendant, as shown by defendant's ledger, page 344.

One item of the account is $241.04, the amount due from plaintiff's brother, Alexander Innis, charged to plaintiff; the date of that charge is October 31, 1859; the charge was made by me by the direction of William Ross, and the books balanced at that time; including this charge, made plaintiff debtor $77; excluding this charge, he had $166 to his credit; the balance against Alexander Innis was struck October 31st, but it had been standing since; the account with Alexander Innis commenced in January, 1857; I did not notify the plaintiff that this charge was made; he was at the other end of the desk at the time Ross directed the charge to be made; the desk is a long one, sixteen feet long, or more; Innis was at one end, and I at the centre; I was there when the order to make the charge was given, and I think Innis was there, but Ross did not direct his attention to the entry; I made the entry immediately; I never communicated to plaintiff that I had made this charge; when I first presented plaintiff with this account containing this charge, it was the first time to my knowledge that he knew of the entry.

The account of Alexander Innis with the defendants was then

given. The witness' attention being called to the account, he further testified as follows:

This is the account of Alexander Innis; the last item of credit is October 31, 1859, by Adam G. Innis, $241.04; the next to the last item of credit is June 16th, 1858, $175 cash; the writing in pencil on this book is "Canada John Ross," who is cashier of defendants; the words in pencil are "on Adam Murray's security;" these words appear across Alexander Innis' account; after the account was delivered to Adam Innis, both the defendants were absent; Innis did not take the money on Saturday, because the defendants were not at home; I advised him not to take the money until the Rosses came back; he came back and worked on Monday in his place as cashier; Innis charged himself with the $166 on the books of Ross on Monday, and took that amount of money from the funds. The witness here referred to the book in which it was charged, and it was called, on the trial, on the "big book;" one column contains all moneys received on sales, the other all money paid out; it is in the handwriting of Canada John Ross; the footing is in Innis' handwriting; there was one charge of $166, "A. G. Innis, $166," in Innis' handwriting; I erased this charge by direction of William Ross, after his return from New York; I found the entry made on Monday morning; William Ross returned from New York about ten or twelve days after the charge was made; I transferred it to the other books on Tuesday morning, and when Ross returned he ordered them all erased; it may have been overlooked in some of the books; the clerks were all paid over a fortnight; a list was made out showing the amount due each salesman and clerk, after deducting the amount of goods purchased by him, and the balance was paid by Innis as cashier; my name was not on the pay roll, nor was Innis'; when I wanted money I got Innis to draw a check, and got one of the Rosses to indorse it; Innis got money in the same way; Innis left Monday night and did not return; I made no inquiry about the entry of $166.

Upon cross-examination, he testified as follows: The entry of Alexander Innis' account to Adam Innis was made October 31, 1859; Innis was cashier, and it was his duty to receive and pay out all cash, and to deposit it in bank to the credit of the defendants; William Ross had given instructions that no amount over $5 was to be paid without a check drawn by Innis and indorsed by one of the Rosses; all money received into the store passed into the custody of Innis; these instructions were given two or three months before Innis left there; when I drew over $5 on my salary I got his check and got Ross to indorse it, and Innis did the same; Innis had access to the ledger, and to all the books; I have seen him looking at the ledger frequently,

18

and looking at his own account in it; I cannot state what month; have seen him look at it frequently; the desk was about sixteen feet long; plaintiff could have heard the directions given to charge his account with Alexander Innis' account, unless he was busy: I can't recollect in what tone he directed me to enter this charge; I presume he spoke in his ordinary tone of voice; his ordinary tone was low; I think he had just come into the store. I find charged to plaintiff's account on books of defendants, January 23, 1857, Alexander Innis' account of $189.42, which was deducted from plaintiff's salary; the pencil marks in petty ledger are in the handwriting of John Ross, the cashier; this is the first time I ever saw them; they must have been made lately. (Witness here looks at checks.) They are in the handwriting of plaintiff, drawn by him to order of Ross, and by him indorsed.

A large number of checks were then given in evidence.

The witness continued: At the time Innis left there twenty-eight checks; the cash sales averaged 1,500 per day; all this money passed through Innis' hands.

. On re-examination, he said: The direction not to pay out over five dollars without drawing check was not always regarded; it was many times disregarded; by this sales book it appears to have been disregarded.

The plaintiff then called *Alexander Innis*, who testified as follows:

I am brother of plaintiff; I was in business in Quincy, Illinois, in 1857 and 1858; 23rd January, 1857, the item of $189.42 was charged to me on defendant's books.

I was short of money at the time, and wrote to my brother; I settled with the defendants after the payment by my brother of the $189.42; the payment was made by my brother at my request, and I afterwards paid him. The defendants never required any guaranty of my account, and my brother never guaranteed the claim, to my knowledge; I never requested my brother to assume the debt; my transactions with the defendants amounted to above $5,000; it was all settled except $160; I failed in August, 1858, and made an assignment to my brother.

On cross-examination he said: I had a number of settlements with the Rosses; I requested my brother to pay this $189, because I had not the money at the time; the account had been due about two weeks; the account was due and ought to have been paid, and I wanted to keep up my credit; at the time I incurred that liability there was no obligation on the part of my brother to pay it; I sometimes sent orders for goods to my brother to be filled, and sometimes bought the goods myself; most of them were bought through orders, because of the pe-

culiar nature of the arrangement; I only bought such goods as would make up my assortment; was to have credit of thirty days from defendants for all goods I purchased of the Rosses; I selected personally only about $800 to $1,000 worth, the rest were purchased by my brother, the plaintiff; the amount of assets transferred to my brother was about $3,000 or $4,000; some were available, and some not; I presume greater part was available; Adam Murray never guaranteed my account to the Rosses to my knowledge; I now reside in Milwaukee; the plaintiff has no interest in my store.

On re-examination, witness testified as follows:

I bought the goods of the Rosses; plaintiff has loaned me money; I don't know how much; I still owe him; I paid him the $180 item charged to him.

The plaintiff here rested his case.

The defendants then called *Robert S. Blackwell,* who, being sworn, testified as follows:

I am an attorney and counselor at law, and have been for many years; William Ross consulted me in 1859; the affidavit for arrest is in my handwriting; I drew it; this paper was sworn to December 27th, 1859; the first person who consulted me about this transaction was John H. Ross; he consulted me with reference to the course which the firm should pursue, in connection with Mr. Innis, at that time one of their clerks; in the course of my cross-examination, as I am in the habit with my clients, I found out that Adam Murray was an uncle of plaintiff, and also a relative of the Rosses; I suggested to Mr. John H. Ross that he had better consult with Mr. Murray about it before taking any steps, and said that I would think the matter over, and give him further advice after he had conferred with Mr. Murray; during this interview John H. Ross said to me that on the discovery of this deficit he had telegraphed William M. Ross, at New York, in reference to it; he stated at the same time, that William had directed him to consult counsel in reference to the matter; this ended my interview with John H. Ross; this was before the 27th December; less than two weeks, I think; not long between this conversation and the date of the affidavit, William M. Ross came home from New York; he called on me, on his arrival, to consult me about this same matter; I stated to him substantially the interview I had had with John H. Ross about this matter; he desired my opinion as to whether he should proceed civilly or criminally against Innis; I listened to his statement of facts, and told him that I could not give him an opinion upon the question submitted to me unless I examined the account of Mr. Innis, and learned the rules of his business by which the clerks in his establishment were

governed, and the usages of the establishment, and conversed with the clerks who were cognizant of the rules and usages, with reference to the question of evidence involved in the case; I thereupon suggested to him that I should go down to the store, and talk with the clerks, and examine the books, and find out the facts; he then left me, after making an appointment to meet me at his store after 12 o'clock of the same day; I accordingly went to the store beeween 12 and 2 P. M.; William M. Ross was not in at the time; I spoke to the book-keeper and asked him if William M. Ross was in; I told my business, and the books were produced before me, and I made an examination; I then inquired of John Ross, the book-keeper, the cashier, and two or three other clerks, in reference to the rules of the store as to the payment of money; and coupling the facts I had learned at the store with the statement of the Rosses, I advised William Ross to proceed criminally against Mr. Innis. I state in this connection, that I gave my opinion in good faith. I learned from John Ross that it was a sort of family affair; the statement made to me by William Ross was, that Innis was some kind of a clerk, or cashier; that he had charge in the store of the funds which were received from the daily sales of the establishment; that it was his duty to deposit the money on hand each afternoon at the hour the bank closed; that no money should be paid to any person over five dollars, except on a check on the bank; these checks over five dollars were to be signed by Innis and indorsed by William M. Ross, if at home, and if absent, by John H. Ross; that no clerk or employee of the establishment could receive a greater sum than five dollars, without conforming to the rules. They further stated that Mr. Innis was cognizant of these rules and had acted upon them; that Innis had a brother residing in Quincy, who had occasionally bought goods from the Rosses for his store at Quincy; that they were *not* satisfied with their course of dealing with Alexander Innis, and declined to sell him further until some satisfactory arrangement was made; they then stated that these facts were brought home to the knowledge of Adam Innis, and that he agreed with them, the Rosses, that he would guarantee such bills of goods or balances, as might exist between the parties from time to time as they were willing to sell him; William M. Ross stated that in pursuance of this oral guarantee of Adam Innis, goods were delivered to Alexander Innis and shipped to Quincy; that Alexander Innis had not performed his agreement with them, and that they had so informed Adam Innis, and that no complaint was made as to the question of liability; Mr. Ross then said that these facts transpired prior to or about the time that he was starting for New York; that is, just before he went

to New York he told Adam that these debts had not been paid, and he made no complaint as to his liability; he said that he then told John to see that the rule was strictly observed with reference to drawing money from the bank; that while in New York he received a telegram from John, informing him of the over-draft by plaintiff; this is substantially the statement made to me by William M. Ross; I afterwards examined the books, and questioned the clerks; Ross then asked me whether I would advise a civil or criminal proceeding; I advised a criminal proceeding, and thereupon wrote the affidavit, and Innis was arrested, examined, and discharged; before the magistrate the Rosses swore to the same facts, substantially, that they had stated to me; after William Ross left for New York, as I understood from John, Innis had threatened to take the money, being the balance of his salary, and he had told him that he would prosecute him criminally if he did; I was present at the examination before Milliken; Adam Murray was called for defense before Milliken, and testified, in substance, on his examination in chief, that William M. Ross, in a conversation with him, stated that if Innis did not settle the matter he would ruin him; I then, at Ross' suggestion, put a particular question to Murray, whether Ross had stated that he would ruin Innis, or that the effect of a criminal prosecution would be to ruin him? Murray replied that he was not certain which form of expression was used, but his impression was that it was that a criminal prosecution would have the effect to ruin him.

Upon cross-examination, he testified as follows: Before I drew the affidavit, I went to the store and examined the books, the account of Innis particularly, and then the cashier, the book-keeper, and several clerks. The book I examined was like the one here shown me. I have no doubt I was told on what book the entry was made. I think the affidavit was written the next day after I went to the store. I found the entry in the books of the money in controversy at the time; I then found out the real amount in controversy. I don't remember whether I examined the large book as to the entry of $166; I know I was shown the very entry of plaintiff himself, in his handwriting, as I was told, in that book, (pointing to the sales book.) William Ross did not tell me that plaintiff assumed this debt to be paid out of the effects assigned to him; this fact was never communicated to me, nor did I ever hear of it until after the examination; I heard before the magistrate, for the first time, of the assignment. I could not say that I asked Mr. Kennedy about what plaintiff said in regard to his conduct; John Ross directed Kennedy to facilitate my examination of the books, and he showed me the accounts of both Innises, and I examined them;

I was told by both the Rosses that they had the right to charge the account to Innis; I made an inquiry as to Adam's guaranty of Alexander's debt, and received a reply from some one; I don't know who corroborated the statement of the Rosses; I learned from all parties, clerks and partners, that the rule was, not to pay out more than $5 without a check; persons there pointed out to me certain items, and gave me instances to show that this was the rule, and they pointed out entries to show that this was the rule; this was to corroborate their statement as to the rule; I found, on examination, this was the rule; I was not told the rule was violated every day; I learned that it had, in pressing instances been violated, but every one understood that was the rule; William M. Ross did not tell me that plaintiff assumed his debt to be paid out of the effects assigned to him, Innis; I never heard of this until after the examination.

The defendant called *John Ross*, who testified as follows: I was in the employ of the defendants in 1859; the night of the 12th of December, Monday, John H. Ross came to me and told me he wanted me to hear what he had to say to Mr. Innis, and while there, John H. Ross forbid Innis from taking money without authority, and told him if he took any money without his consent he would hold him subject to a criminal action; Innis left the store that evening, and never came afterwards; they were talking of a balance of salary claimed by Innis; this was $166 according to the books.

On his cross-examination, he said: This conversation must have been about 8 o'clock P. M.; I had no particular position in the store at that time; I was employed to superintend the desk, to see that things went on right; Mr. Ross said in New York that he wanted to get an easier situation; my employment was to see that the proper entries were made in the books; I was sitting by the stove near the desk; John H. Ross told me to come to the desk and hear what he had to say to Mr. Innis; I don't know whether the entry of $166 on the sales book was made at that time; I understood that Innis asked Ross for the money; I don't know at what time; I don't know that Ross had then seen the entry; Innis told Ross that he could not prevent him taking his salary; I left fifteen or twenty minutes after the conversation and went to the stove; Innis was at the desk then; I think Innis left the store before I did.

I knew of the regulation not to pay over $5 without a check; I went to the store in September, 1859; I was told of the rule afterwards when making a charge to myself, subsequent to being told of it; I have violated the rule, I presume; Mr. Ross was standing by at the time, and directed me to charge it; I have spoken to Kennedy of the propriety of his being absent at the

time of the examination; the circumstances were these—Mr. Kennedy felt hurt about some conversation had with William Ross, who claimed that Kennedy was prejudiced in favor of the plaintiff; I then advised him to go away so as not to place himself in the power of the party; the entry in pencil on petty ledger was made by me by mistake; the books were in our room; we roomed together; we had this book together; in looking over the accounts John H. Ross said that Innis never got goods without guarantee; I wrote this by mistake; it should have been written opposite *William* Innis' account, which is on the same page and just below Alexander Innis' account; Adam Murray had William's account, as I understood it, and so wrote it; this entry was made on Friday last.

On being re-examined by defendants, he testified, that when Innis said they could not prevent his taking his salary, John H. Ross replied, that if they owed him anything, to present his bill, and when his brother returned from New York he could settle it, as he understood from William, he and Innis had an arrangement.

The defendants gave some evidence to show that plaintiff, since he left the defendants, had been doing a successful business, and therefore claimed he had not sustained any damages.

The defendants proved that the following telegram had been received by John H. Ross, one of the defendants, on the 13th December, 1859:

*" New York, December* 13, 1859.

To W. M. Ross & Co:

If Hervey advises, arrest Innis for embezzlement. I have telegraphed Carver to pay for your signature. W. M. ROSS."

The court gave the following instructions to the jury on the part of the plaintiff:

1. If the jury are satisfied, by the evidence, that the defendants knew, at the time they advised with their attorney, that the plaintiff in good faith claimed, and had a *prima facie* right to pay himself the money on his salary, and that he had often done so before, and did not state that fact to their attorney, then the attorney's advice is no protection to them, nor was there probable cause for causing the plaintiff's arrest and trial on the alleged charge of stealing the money, if such claim was made honestly and in good faith.

2. The jury are instructed, as matter of law, that if the jury shall find, from the evidence, that the fact that the plaintiff in this case disputed the right of the defendants to charge him with his brother's account, and that the defendants knew that fact, and that if they shall also find that the plaintiff claimed the right to pay himself the $166 for his salary, and

that that fact was known to the defendants at the time they consulted Blackwell, then the jury are instructed that those were material facts to be communicated to counsel.

3.    The jury are further instructed that the fact that the rule as to payment as to sums over five dollars was frequently violated, (if that fact be found by the jury,) was a material fact to be communicated to the counsel when his advice was sought. This is so if defendants knew and remembered the fact at the time of taking counsel.

4.    The jury are instructed, as matter of law, that to entitle the defense of advice of counsel to avail the defendants, all the facts and circumstances known to the party seeking the advice, or which he ought to have ascertained by careful and diligent inquiry, must be fairly, and in good faith, laid before the counsel for his opinion ; and if the jury shall believe, from the evidence, that any material and important fact known to the defendant, or which he could have ascertained by careful inquiry, was kept back from the counsel, then that the advice given on such a partial statement is not a protection.

5.    If the jury shall find, from the evidence, that the plaintiff, Adam G. Innis, up to the time of his arrest for embezzlement, bore uniformly a good reputation for honesty, for integrity, and the defendants acknowledged that the plaintiff bore such character, in their estimation, up to the time of his arrest for embezzlement, then that is strong evidence that the defendants had no probable cause for causing the arrest of the plaintiff for embezzlement, (23 Ill. 575,) unless very strong circumstances of guilt existed to base a criminal charge upon as against plaintiff Innis.

6.    If the jury believe, from the evidence, that the plaintiff was charged, arrested, and treated as stated in his declaration, and that the defendants knew, at the time of making the charge, that the plaintiff, as their cashier, paid himself the money in question for his services, earned to that date, crediting them and charging himself with the same on the books in the usual way, claiming it as his right so to do, then in such case these acts do not constitute probable cause for making said charge and arrest.

7.    If the jury believe, from the evidence, that the plaintiff was then and there, and had been several years, cashier for defendants, when he paid himself the money for his services rendered them, and that he had often done so before, with their knowledge and assent, he crediting them and charging himself for the same on their books, kept for the purpose, and when told by one of them he must return the money, or they would have him arrested for stealing it, he claimed his right to pay it to

himself; all of which, if the jury find, from the evidence, the defendants knew, when they caused his arrest, then, in such case, there was no probable cause for the arrest.

8. If the jury believe, from the evidence, that the defendants made the charge of embezzlement falsely, maliciously and without probable cause, to destroy the plaintiff's reputation for honesty, in Chicago, and to prevent his getting employment in Chicago, and that they obtained the opinion of counsel upon a false or partial statement of facts, as they understood them, then such opinion, if so obtained, would offer no protection to them, and the plaintiff, in such case, ought to recover, and the jury, in such case, may give exemplary damages.

9. That in order to render the advice of counsel any protection to the defendants in this action, the jury must be satisfied, from the evidence, that such advice was sought in good faith, and that a fair, full and true statement of all the facts were then submitted to the counsel, and that they, in instituting the prosecution, were induced to act, and acted on such advice without a previous determination to prosecute the plaintiff, whether so advised or not.

10. If the jury believe, from the evidence, that the defendants instituted the criminal prosecution from a fixed determination of their own, rather than from the opinion of legal counsel, or that a full, fair, and true statement of all the facts was not submitted to the counsel, then, in either case, the opinion given by the counsel is no defense to this action, if the charge was false and made without probable cause.

11. If the jury, from the evidence, find the defendants, or either of them, guilty, as charged in the declaration, they will assess the plaintiff's damages, and they are not confined to the actual damages proved, but may give reasonable exemplary damages.

To the giving of each of the above instructions, the defendants excepted.

The court then gave the following instructions on the part of the defendants:

If the defendants had any probable cause to institute the criminal proceedings, then the plaintiff cannot recover; probable cause is defined to be a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged.

If the jury believe, from the evidence in this case, that the defendants fully and fairly stated all the facts and circumstances in relation to the criminal prosecution to respectable counsel, and that such counsel advised them to institute the criminal pro-

ceedings, and the defendants, in good faith, acted upon such advice, then the plaintiff cannot maintain this action, whether such advice was correct or not, and whether the defendant in the criminal prosecution was guilty or not.

If the jury believe, from the evidence, that the defendants, or either of them, testified before the magistrate to facts particularly within their knowledge, in the communication of the charge made by them against the plaintiff, that plaintiff had agreed to assume and pay the debt of Alexander Innis, and if they further believe that said defendants, in good faith, believed that the plaintiff had so agreed to pay and assume the same, then the testimony so given by said defendants, or either of them, is evidence in this case as to the existence of the probable cause for making the criminal charge complained by the plaintiff.

The following instructions were asked by the defendants to be given to the jury, and each of them were refused by the court:

1. There is no evidence in this case that the plaintiff did not make an arrangement with the defendants, or one of them, by which he assumed to pay and become personally liable to pay the debt due defendants by Alexander Innis.

2. Probable cause is a question of law, and there being no dispute as to facts of the case, the court instruct the jury, as a matter of law, that there was probable cause for the prosecution of the criminal action in this case, and therefore the plaintiff cannot recover.

3. If the jury believe, from the evidence, that there was an agreement between either of the defendants and the plaintiff, by which the defendants, in good faith, understood and believed that the plaintiff had stipulated and assumed to pay the debt of Alexander Innis, and thereby became personally liable for the same, then there is probable cause for the prosecution instituted by the defendants, and plaintiff is not entitled to recover, provided the jury further find that said plaintiff took any money belonging to defendants without their consent and permission, and the evidence of the defendants before the magistrate, upon the criminal charge, is to be considered by the jury as evidence in this case as to the facts testified to by said defendants.

4. If the jury shall believe, from the evidence, that the defendants had a rule that the employees in their store should not take or pay out any money over $5, without a check drawn by the cashier and countersigned by one of the Rosses, and that the plaintiff had guaranteed his brother Alexander's debt of $241, and that the same was charged to him on defendant's books, and that plaintiff, while a clerk in defendant's store, came into possession of $166, money received from sales of defend-

ant's goods, and while the rule was in force, and with knowledge of it, refused to pay over money, or deposit, but against the remonstrance of defendants, or either of them, appropriated the money to his own use, then there was probable cause, and this action cannot be maintained.

To the refusing of each of said instructions by the court, the defendants excepted.

The court thereupon gave the following instructions:

" This is an action for malicious prosecution, and to entitle the plaintiff to recover, he ought to show, first, that the prosecution was ended ; that the proceeding was malicious; that it was without probable cause. There seems to be no contradictory evidence in regard to the termination of the criminal proceedings against the plaintiff, and the jury will need no particular instructions on this point beyond this — that a discharge by the justice of the party arrested would be a sufficient termination of the proceedings, under a warrant issued by such justice. The second proposition necessary to be established by the plaintiff is, that the proceedings were maliciously instituted or set on foot by the defendant. The term malice in this form of action is not to be considered in the sense of spite or hatred against an individual, but of an evilly disposed mind, and as denoting that the party was actuated by improper and sinister motives. The jury will determine from all the facts and circumstances proven in this case, whether the defendants were actuated by malice in their procuring the arrest of the plaintiff or not. The third point necessary for the plaintiff to establish, in order to entitle him to recover, is, that the criminal proceedings instituted against him by the defendants, were without any probable cause, proof of express malice without showing also the want of probable cause. The burthen of proof in this case is upon the plaintiff, and the jury ought to presume that the defendants believed in the truth of the information and evidence given by them, and of the statements contained in the affidavit for arrest, unless it clearly appears from the evidence, that the evidence of defendants was false, and that the defendants knew it to be so, or by reasonable diligence could have ascertained that it was false. What is probable cause where the facts are not disputed, is a question of law, but in this case the facts are disputed and it is proper for the court to instruct you as to the law concerning probable cause, and the jury should find whether the necessary facts have been proved, on the part of the plaintiff, to make out a want of probable cause. If the plaintiff was cashier of the defendants, and as such cashier received money belonging to the defendants, and without the knowledge or consent of the defendants, or either of them, and against their will and

consent, the said plaintiff did feloniously convert and appropriate to his own use and embezzle from the said William M. Ross & Co., the defendants, with an intent then and there to steal the same, the said sum of one hundred and sixty-six dollars, as stated in the affidavit of said William M. Ross, and that the said money then and there was the property of the said defendants, at the time of said conversion, this would be sufficient probable cause to justify the defendants in causing the arrest of the plaintiff; but if the jury believe, from the testimony, that the plaintiff honestly believed that he had a right to take the money and charge it to himself, and he did so take such money and charge himself with the amount on the books of the defendants, then even if he had guaranteed the debt of Alexander Innis, he would not be guilty of embezzlement, and such taking of the money under such circumstances, would not constitute a probable cause for the prosecution of the plaintiff criminally, for such taking of the money of the plaintiff from the defendants; even if the plaintiff had verbally agreed to pay the debt of his brother, Alexander Innis, and took the money belonging to Ross & Co., in his possession, believing that he had a good right so to do, and made the proper entries in the book of Ross & Co., charging himself with the money so taken by plaintiff, he would not be criminally liable, and such conduct would not constitute probable cause for a criminal prosecution for embezzlement. Probable cause is justly defined to be a suspicion or belief, founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true. A belief that is groundless, or which could not have been formed without the grossest ignorance or negligence, would not constitute probable cause within the meaning of the law. The jury ought to apply to all the evidence in the case, the test—the rules of law given to them by the court. Ask yourselves conscientiously, are the facts and circumstances that you have found to exist so strong in themselves as to warrant an impartial and ingenuous and reasonable man of common capacity, with the caution usually exercised by such a man in the defendant's situation, but under the influence of any improper motive, to believe the plaintiff guilty of the crime charged against him? If they are sufficient to warrant that belief on such a mind, that conclusion, when deliberately arrived at by you, will entitle the defendants to a verdict of not guilty; if you find otherwise, then you will find whether defendants are guilty; and if guilty, then you will assess the damages for the plaintiff. The defendants claim protection in this case by reason of having been advised to prosecute the plaintiff by counsel. The true rule in this matter seems to be this: that the defendants may give in evidence to

Ross et al. *v.* Innis.

show probable cause, and to negative malice, that he proceeded in the case in good faith, upon the advice of counsel learned in the law, given upon a full representation of the facts. It must appear, to make this a good defense, that defendants communicated to said counsel all the facts bearing upon the guilt or innocence of the accused, which he knew, or by reasonable diligence could have ascertained, and that he in good faith acted under such advice. If the jury are satisfied, from the evidence, that the defendants acted in good faith on the advice given, and did only follow such advice so given, then they are not liable to an action for malicious prosecution."

To the giving of which instruction the defendants excepted; that is, to so much thereof as relates to probable cause, and the court's definition of the same.

The jury found a verdict for plaintiff for $3,000.

The defendants moved the court to set aside the verdict, and grant a new trial upon the following grounds, to wit:

The court erred in not giving the instructions asked for by the defendants.

The court erred in altering and amending the defendants' instructions, and also in giving the instruction by the court.

The court erred in giving the instructions on the part of the plaintiff.

The verdict is against evidence.

The verdict is against law.

The damages are excessive.

The motion was overruled, and a judgment was entered upon the verdict, to which ruling of the court the defendants excepted.

The defendants prayed an appeal to this court.

E. VAN BUREN, and R. T. MERRICK, for Appellants.

HERVEY, ANTHONY & GALT, and W. A. PORTER, for Appellee.

CATON, C. J. In the charge to the jury upon the trial of this cause, the court told them: "What is probable cause where the facts are not disputed, is a question of law; but in this case the facts are disputed, and it is proper for the court to instruct you as to the law concerning probable cause, and the jury should find whether the necessary facts have been proved, on the part of the plaintiff, to make out a want of probable cause. If the plaintiff was cashier of the defendants, and as such cashier received money belonging to the defendants, and without the knowledge or consent of the defendants, or either of them, and against their will and consent, the said plaintiff did feloniously

Ross et al. *v.* Innis.

convert and appropriate to his own use and embezzle from the said William M. Ross & Co., the defendants, with an intent then and there to steal the same, the said sum of one hundred and sixty-six dollars, as stated in the affidavit of said William M. Ross, and that the said money then and there was the property of the said defendants at the time of said conversion, this would be a sufficient probable cause to justify the defendants in causing the arrest of the plaintiff; but if the jury believe, from the testimony, that the plaintiff honestly believed that he had a right to take the money, and charge it to himself, and he did so take such money and charge himself with the amount on the books of the defendants, then, even if he had guaranteed the debt of Alexander Innis, he would not be guilty of embezzlement, and such taking of the money under such circumstances, would not constitute probable cause for the prosecution of the plaintiff criminally for such taking of the money of the plaintiff from the defendants; even if the plaintiff had verbally agreed to pay the debt of his brother, Alexander Innis, and took money belonging to Ross & Co., in his possession, believing that he had a good right so to do, and made the proper entries in the book of Ross & Co., charging himself with the money so taken by plaintiff, he would not be criminally liable, and such conduct would not constitute probable cause for a criminal prosecution for embezzlement." Now, this is a very accurate statement of the law, to enable the jury to determine whether the plaintiff had been guilty of the crime of embezzlement or not; but the court substantially told the jury if the facts did not exist which were necessary to constitute the crime, then there was not probable cause. The law does not require that a crime should have been committed before probable cause can exist. In the first place, the court supposed a state of facts which, if true, made the plaintiff guilty of the crime charged, and told the jury if they found those facts to be true, then there was probable cause; and then the court supposed another state of facts which, if true, showed that the defendant was not guilty, and told the jury that if they found this state of facts to be true, then there was not probable cause. This was, no doubt, inadvertent on the part of the court, for the distinction between actual guilt and a reasonable belief of guilt, as constituting probable cause or a want of it, is well stated in other parts of the charge; and were we well satisfied with this verdict, we might perhaps assume that when the whole charge is considered together, the jury had not been misled by this inaccuracy.

But there is one feature in this case which we are convinced could not have had its due weight with the jury, although the court in its charge called the attention of the jury to it, and

laid down the law to them very accurately on the subject. Before this prosecution was instituted, Wm. M. Ross went to Mr. Blackwell, a counselor of this court, who had for many years borne a high reputation, both as a civil and a criminal lawyer, and stated to him all the facts of the case, fully and unreservedly, and wished his advice whether to prosecute Innis civilly or criminally. Mr. Blackwell did not venture an opinion upon Ross' own statement, but went to the store, examined the clerks and the books, and after taking time for mature consideration, advised the institution of the criminal prosecution, and himself drew up the affidavit on which it was founded. Now it is not questioned, that if this be true, and that Ross acted in good faith on the advice of Blackwell, there is the absence of that malice which is essential to the maintenance of the action. Here was everything to inspire Ross with confidence in Blackwell's opinion and advice. The facts were carefully examined by counsel, and time taken for consideration; and certainly if ever a man was justified in proceeding with confidence on professional advice received, then was Mr. Ross so justified. Blackwell testifies that the facts were stated to him the same as they were sworn to on the examination before the magistrate, and the only thing open to dispute was the *quo animo* of Innis. Upon the case thus investigated the prosecution was advised, and upon that advice the prosecution was instituted. If Ross acted in good faith on this advice, the law must protect him. If he resorted to this contrivance to cover up his malice, and to protect him from its consequences, knowing, or believing all the time, that no offense had been committed, then, indeed, he was even more guilty for having taken the course he did. But we see nothing in this record to justify this conclusion, nor do we believe the jury deliberately intended so to find. The judgment must be reversed, and the cause remanded.

*Judgment reversed.*